Brian E. Maas
Andrew J. Ungberg
FRANKFURT KURNIT KLEIN & SELZ, P.C.
488 Madison Avenue
New York, New York 10022
Tel: (212) 980-0120
Fax: (212) 593-9175
bmaas@fkks.com
aungberg@fkks.com

*Attorneys for Plaintiffs James Campbell and Kevin Rudolf*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------X

JAMES CAMPBELL and KEVIN RUDOLF

    Plaintiffs,

v.

ISHITA GANGULY

    Defendant.

----------------------------------------X

Index No. _____

**COMPLAINT AND
JURY DEMAND**

Plaintiffs James Campbell and Kevin Rudolf (together, "Plaintiffs"), by and through their undersigned attorneys, for their Complaint against Defendant Ishita Ganguly ("Defendant" or "Ganguly") hereby allege as follows:

## NATURE OF THE ACTION

1. This is an action to recover $2,000,000 that Defendant Ganguly induced Plaintiffs to entrust to her, allegedly to be invested in an investment scheme, which Ganguly then used for her personal benefit. In short, Ganguly represented to each of the Plaintiffs that she worked for a firm looking for clients for a special, invite-only investment program. Ganguly represented, *inter alia*, that the investment program offered returns at a substantial multiple of the required $1,000,000 up-front investment, and that Plaintiffs faced no investment risk because their funds

would be at all times be held in a secure escrow account over which she had control. Based on Ganguly's representations concerning the investment program and the safety of their funds, both Plaintiffs separately invested in the program, and each transferred $1,000,000 into the bank account designated by Ganguly.

2. None of Ganguly's representations concerning the investment program or the handling of plaintiffs' investments have turned out to be true. Not only have Plaintiffs not received any of the investment returns that were promised, but despite their frequent demands, they have not received back the $1,000,000 that each transferred into the bank account designated by Ganguly. Moreover, while Plaintiffs were being told by Ganguly's confederate, Paul Phillips — who purported to be the head of the investment company — that the investment programs had encountered various problems and that Plaintiffs funds would be returned shortly, Ganguly was withdrawing Plaintiffs' funds from the supposedly secure account and using the funds for her own purposes. The Plaintiffs are accordingly entitled to judgment against Ganguly in an amount not less than $2,000,000, as well as punitive damages, costs, including attorneys fees, and interest.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the matter in controversy exceeds $75,000.

4. This Court has personal jurisdiction over Defendant as she lives and conducts business in New York, and venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 (a)(1) and (b), because the Defendant resides in Richmond County, New York.

## PARTIES

5. Plaintiff James Campbell is an individual residing in Oakland County, Michigan.

6. Plaintiff Kevin Rudolf is an individual residing in Miami-Dade County, Florida.

7. Upon information and belief, Defendant Ishita Ganguly is an individual residing at 151 Nicolosi Drive, Staten Island, New York 10312.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

**Ganguly Induces Plaintiff Rudolf to Invest in the Scheme**

8. On or about April 18, 2012, after being introduced by a common acquaintance, Mr. Rudolf spoke to Ganguly via telephone. On this call, Ganguly introduced herself as a Managing Director for Astute Partners (BVI) Ltd. ("Astute"), a company that she described as a private investment firm supposedly working to promote humanitarian, social, and economic development projects. Ganguly said she was searching for potential clients for an invitation-only "capital leverage program" that Astute was operating (the "Astute Program"), and wanted to use the phone call as an opportunity to describe the program to Mr. Rudolf.

9. Ganguly then represented to Mr. Rudolf that the Astute Program worked as follows:

10. First, Mr. Rudolf was to wire at least $1,000,000 into what Ganguly characterized as a "non-depletion account" at Citibank in New York. She explained that the "non-depletion" designation meant that Mr. Rudolf's money would remain at all times in the account, and would therefore not be subject to any investment risk. According to Ganguly, the money in the "non-depletion" account was to be pledged as collateral for Astute's investment trading through Barclays in London.

11. Second, Ganguly explained that, having pledged the invested funds as collateral to Barclays, Astute would then engage in transactions in so-called "discounted medium-term

prime bank note guarantees" or other available investment vehicles offering a significant rate of return.

12. Third, Ganguly represented that after twenty-one banking days, Astute's investment positions would be liquidated at a substantial profit, and Mr. Rudolf would then have the option of receiving back his initial $1,000,000 investment plus a substantial return or reinvesting the proceeds from Astute's initial investments in Astute's "Managed Buy/Sell Program" for the opportunity to earn even greater returns.

13. Ganguly represented that the Astute Program could earn such returns in part because it was part of a larger partnership between several prominent multinational banks and intergovernmental organizations working to generate financing for charitable, humanitarian, and economic projects in the developing world. Ganguly explained that the banks in this partnership kept these lucrative trading opportunities confidential in order to avoid a market rush that would both eliminate the chance for the banks to reap significant returns and the opportunity to use a portion of those returns for charitable purposes. Ganguly stated that, as a participant in this confidential partnership, Astute was uniquely positioned to offer Mr. Rudolf investment returns that were unavailable anywhere else in the finance industry.

14. As part of her inducement for Mr. Rudolf to participate in the Astute program, Ganguly assured Mr. Rudolf that there was no risk to Mr. Rudolf should he invest in the program because his money would at all times be held in a secure "blocked" account at Citibank, over which Ganguly would exercise control so that the funds would not be exposed to any investment risk. Ganguly explained that even in the worst-case scenario, Mr. Rudolf could always recover his original $1,000,000 investment.

15. On April 19, 2011, Ganguly sent Mr. Rudolf a follow-up email confirming the essential details of the leverage program. Around this same time, Ganguly also provided

Mr. Rudolf with a "Capital Contribution Contract" for the Astute Program. Ganguly made it clear that Mr. Rudolf would not be able to participate in the Astute Program unless he signed the Capital Contribution Contract and transferred $1,000,000 pursuant to its terms.

16. The Capital Contribution Contract listed an individual named Paul D. Phillips of Mayfair, London, as Astute's Chief Executive Officer, and Ganguly as "Managing Director of Global Trading and Authorized Signatory." The agreement did not specify any other individuals as representatives of Astute. The agreement also directed Mr. Rudolf to wire $1,000,000 to Astute at an account at Citibank in New York, New York under the name "Astute Partners Corp." and listed Ganguly as an "account signatory."

17. The Capital Contribution Contract stated that after twenty-one banking days from the execution of the agreement and subsequent wire transfer, Astute "shall return in full to [Mr. Rudolf] the Cash Funds in the amount of $1,000,000.00 (Initial Deposit Investment)" as well as a substantial return on his investment.

18. In reliance on Ganguly's representations about the Astute Program, and the safety of his funds, Mr. Rudolf decided to invest in the Astute Program. He signed the Capital Contribution Contract on or around April 21, 2012.

19. On or around April 23, 2012, Mr. Rudolf then wired $1,000,000 to the Citibank account in New York specified in the Capital Contribution Contract. Upon information and belief, this Citibank account was under the direct control of Ganguly. Upon information and belief, after Mr. Rudolf transferred his money into Ganguly's account, Ganguly diverted Mr. Rudolf's funds to her personal benefit. The funds have not been returned to Mr. Rudolf.

**Ganguly Induces Plaintiff Campbell to Invest in the Scheme**

20. On or around May 15, 2012, Ganguly obtained Mr. Campbell's contact information from a common acquaintance, and sent him an email about the Astute Program. As

she had done with Mr. Rudolf, Ganguly represented herself as a Managing Director of Astute, and recommended that Mr. Campbell become an investor in the same Astute Program that she had previously described to Mr. Rudolf.

21. Along with her May 15, 2012 email, Ganguly sent Mr. Campbell a two-page document describing the "Leverage Trade Program." This summary document stated that clients could be accepted into the program based on a $1,000,000 investment, and lists the "Procedures" for the program as follows:

1. Client submits CIS, passport, current bank statement no older than 3 days old signed by two banking officers) and Authorization to Verify funds with Client's banker.

2. Compliance review made over 3 business days maximum.

3. Contract issued to client.

4. Client executes and returns contract.

5. Trader countersigns contract and returns to client.

6. Client instructs banker to wire transfer Client's funds to Platform Company's account at Major Bank ("Asset Bank") in country where funds currently reside; Major Bank holds funds in a non depletion manner such that principal deposit can only be returned to Client at end of term. CASH NEVER LEAVES PLATFORM'S COMPANY'S BANK ACCOUNT.

7. Trader's bank ("Platform Bank") confirms with Asset Bank that cash in the Platform Company's account is "mirrored" by Platform Bank (major European bank); Trader leverages his funds in Platform Bank and initiates a credit line for the Leverage Period of 21 banking days.

8. Client funds for trade derive from 21 banking day Leverage Period and are attributable to Client based upon Cash Entry Amount (no pay outs during this period). Client is offered three Payout Options three days before 21st banking day. . . .

\* \* \* \*

22. The program described in the summary sheet is the same Astute Program that Ganguly described to Mr. Rudolf. Among the representations made in the summary sheet presented by Ganguly was the representation that Mr. Campbell's $1,000,000 investment would be securely held in an escrow account, and that it would not be exposed to investment risk because the funds would not actually leave the account.

23. On or about May 17, 2012, Ganguly emailed Mr. Campbell a copy of the Capital Contribution Contract along with wire instructions. This Capital Contribution Contract was substantially the same as the one provided to Mr. Rudolf on or around April 19, 2012.

24. As before, the Capital Contribution Contract listed Paul D. Phillips of Mayfair London as Astute's CEO and Ganguly as "Managing Director of Global Trading and Authorized Signatory." The agreement also required Mr. Campbell to wire $1,000,000 to the same Astute account at Citibank in New York, New York to which Mr. Rudolf had sent his funds. This account was under the name "Astute Partners Corp." and listed Ganguly as an "account signatory."

25. The Capital Contribution Contract stated that after twenty-one banking days from the execution of the agreement and subsequent wire transfer, Astute "shall return in full to [Mr. Campbell] the Cash Funds in the amount of $1,000,000.00 (Initial Deposit Investment)" as well as a substantial return on his investment.

26. In reliance on Ganguly's representations about the Astute Program, and the summary document and Capital Contribution Contract provided by Ganguly, Mr. Campbell decided to become an investor in the Astute Program. He signed the agreement on or about May 17, 2012.

27. Shortly thereafter, on or about May 21, 2012, Mr. Campbell wired $1,000,000 to the Citibank account specified in the Capital Contribution Contract. On May 24, 2012, Ganguly

sent Mr. Campbell an email confirming that she had received his wire. Upon information and belief, this Citibank account was under the direct control of Ganguly. Upon information and belief, after Mr. Campbell transferred his money into Ganguly's account, Ganguly diverted the funds to her personal benefit. Mr. Campbell has not received back any of his funds.

**Ganguly and Phillips Misrepresent to Rudolf and Campbell the Status of Their Funds**

28. Shortly after the Plaintiffs made their respective wire transfers into Ganguly's account, they began to ask for updates about the progress of the Astute Program. Starting in late May 2012, Ganguly ceased all communication with the Plaintiffs and instead Plaintiffs and a third investor in the Astute investment program began communicating with Phillips, the other Astute representative listed in the Capital Contribution Contracts, to seek information about the status of their funds and their investments in the Astute Program.

29. For example, on June 10, 2012, Mr. Campbell sent an email to Ganguly, Phillips, and "compliance@astutepartners.com," an address that Ganguly had represented was connected to Astute's compliance department. In this email, Mr. Campbell expressed concern about the Astute Program, saying "I am concerned about the lack of specific and definitive communication regarding what to expect and when to expect it. . . [I]t is important to note that this process has taken what seems to me an inordinately long time. In fact it will be 3 weeks on Monday since I transferred funds to you." The very next day, on June 11, 2012, Mr. Campbell received an email from "Astute Partners Compliance <compliance@astutepartners.com> "stating "[a]s of today, 11, June 2012 Barclays Bank has commenced the process of blocking the 1,000,000.00 USD from the Citi account. Once that process has been successfully completed and a letter has been sent to Paul D. Phillips, we shall inform you of the start date for the trade program." Upon information and belief, there is no "compliance department" at Astute, and the statements in this

email were misrepresentations intended to assuage Mr. Campbell's concerns while stalling for more time.

30. In June 2012, Ganguly told another Astute Program investor that he and the Plaintiffs each had to prepare a "Use of Funds Letter" designating the non-profit organization that each investor wanted to be a beneficiary of the Astute Program's charitable giving and that the Astute trading program could not begin until that information was provided. Upon information and belief, Ganguly intended this letter to convince Plaintiffs that the Astute program was real and that they need not be concerned about the safety of their funds. Ganguly's request was communicated to both Plaintiffs, and they both drafted responses to Ganguly.

31. On June 19, 2012, Mr. Campbell sent an email to Ganguly, Phillips and the Astute "compliance department" enclosing his list of charitable organizations in response to Ganguly's request. On June 25, 2012, Mr. Rudolf sent a similar email to Phillips, Ganguly, and the "compliance department" enclosing his charitable project. Based on Ganguly's representations, the Plaintiffs believed that the submissions were required in order for their investment to enter the Astute Program, and believed that the delay in the program to that point was due to the fact that Astute was waiting for their submissions.

32. On June 28, 2012, Phillips sent separate, nearly identical emails to both Mr. Campbell and Mr. Rudolf acknowledging the receipt of their "Use of Funds" submissions. These emails also contained virtually identical language representing that the Astute Program was experiencing problems. Phillips wrote:

> I would also like to apologise personally for the delay in the program, the lack of information coming back to you, and indeed this response, it has been unforgivable on my part, and I extend my personal apologies for this.
>
> We were still working on the building blocks for our Program, which was designed for small charities who desird [sic] further funding, unfortunately the concept of the program go out quicker than we had wanted and we were no [sic]

quite ready for the response. We had not worked through all the issues with the program, it was not a 'tried and tested' system and we encountered problems that we had to work through.

At the moment we are not taking any new clients, and the existing clients have suffered delays, however we are through most of it now – and we will go back and do our run through the program ourselves now with our own money so we can access that we have fixed all the issues . . .

33. In this email, Phillips stated that he was planning to visit the United States "in the next couple weeks" and that he wanted to meet with the Plaintiffs and another investor to discuss further investment opportunities. He stated "the initial investment you made will be returned in the next couple of days to you."

34. Upon information and belief, all of the information contained in the email was false, and was provided as part of Phillips and Ganguly's scheme to lull Plaintiffs into believing that their funds were still secure and that the Astute program was still going to succeed when Ganguly in fact had already begun to divert Plaintiffs' funds.

35. Over the next several months, Plaintiffs periodically contacted Ganguly and Phillips asking for updates on the Astute Project, and Phillips continued to provide Plaintiffs with more false excuses for the ongoing delay in returning Plaintiffs' investment.

36. Despite repeated requests that their initial investment be returned, Plaintiffs have not received any of their money back. Upon information and belief, Ganguly has diverted Plaintiffs' money for her own personal benefit by among other things:

    a. between on or about April 17, 2012 and May 21, 2012, purchasing approximately $300,000 worth of jewelry for herself;

    b. between on or about April 30, 2012 and June 6, 2012, transferring approximately $800,000 out of the "Astute Corp." bank account and into other business and personal accounts that Ganguly controlled; and

      c.      on or about August 9, 2012, purchasing a home on Staten Island for approximately $2,200,000.

37.    Upon information and belief, the house Ganguly purchased with the Plaintiffs' stolen funds is her current residence at 151 Nicolosi Drive, Staten Island, New York 10312.

## FIRST CLAIM FOR RELIEF
### (Fraud in the Inducement)

38.    Plaintiffs allege paragraphs 1 through 37 as if fully set forth here.

39.    As stated above, Ganguly made multiple representations to Plaintiffs that induced them each to transfer $1,000,000 to the Astute account at Citibank including, but not limited to, that:

    i.    she was a Managing Director of Astute seeking clients for its invitation-only leverage program;

    ii.    Astute was a legitimate business concern with access to the international finance market;

    iii.    the Astute Program was a genuine investment program;

    iv.    after a period of approximately twenty-one banking days, Plaintiffs' money would be returned to them along with a significant profit;

    v.    each of Plaintiffs' up-front investments of $1,000,000 would be at all times held in a secure Citibank escrow account;

    vi.    Plaintiffs' investment would not be subject to any risk of loss because it would be kept in such an escrow account;

    vii.    even in the worst-case scenario, Plaintiffs would be able to recover their respective $1,000,000 initial investments from the secure escrow account.

40.    Ganguly's representations regarding Astute and the Astute Program were false, and Ganguly knew this at the time she made the representations to each of the Plaintiffs.

41.    Ganguly made these representations specifically to induce each of the Plaintiffs to believe in and rely on them.

42. Mr. Rudolf and Mr. Campbell reasonably believed in and relied on Ganguly's representations, and were completely unaware that such representations were false.

43. Based on their belief in and reliance on Ganguly's representations, each of the Plaintiffs wired $1,000,000 into a bank account that Ganguly controlled. These funds have not been returned despite plaintiffs' demand for their return.

44. As a result of the false representations of Defendant Ganguly and others, Plaintiffs have suffered damages in an amount to be determined at trial but believed to be at a minimum the amount of $2,000,000 that was transferred to the Astute account, plus punitive damages, and Plaintiffs' costs in seeking recovery of their funds including but not limited to their legal fees.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

45. Plaintiffs allege paragraphs 1 through 44 as if fully set forth here.

46. Each of the Plaintiffs wired $1,000,000 to the Astute account controlled by Ganguly intending the funds to be an investment in the Astute Program. On information and belief, Plaintiffs' funds were never used as part of the Astute Program or any other investment but were instead diverted by Ganguly for her personal use and benefit.

47. Neither Plaintiff was indebted to Ganguly in any way, nor did Ganguly provide any goods or services of any kind that would have entitled her to receive money from Plaintiffs. Ganguly was therefore unjustly enriched as a result of using Plaintiffs' money for her own benefit. It would be manifestly against equity and good conscience to permit Ganguly to retain Plaintiffs' money.

48. As a result of Defendant Ganguly's unjust enrichment at the expense of the Plaintiffs, Plaintiffs have suffered damages in an amount to be determined at trial, plus punitive

damages, and Plaintiffs' costs in seeking recovery of their funds including but not limited to their legal fees.

### THIRD CLAIM FOR RELIEF
(Conversion)

49. Plaintiffs allege paragraphs 1 through 48 as if fully set forth here.

50. Plaintiffs each transferred $1,000,000 of their own money to a bank account controlled by Ganguly, supposedly to be used in connection with the Astute Program.

51. This money was provided to Ganguly in her apparent capacity as agent of Astute to be held for a period of approximately twenty-one banking days. At no time did Plaintiffs transfer ownership of this money to Astute or Ganguly.

52. Upon information and belief, Ganguly has diverted Plaintiffs' money for her own personal benefit. Ganguly has refused to return Plaintiffs' money, and in so doing has interfered with Plaintiffs' property without any claim of right to the funds.

53. As a result of Defendant Ganguly's conversion of Plaintiffs' property, Plaintiffs have suffered damages in an amount to be determined at trial, plus punitive damages, and Plaintiffs' costs in seeking recovery of their funds including but not limited to their legal fees.

### FOURTH CLAIM FOR RELIEF
(Constructive Trust)

54. Plaintiffs allege paragraphs 1 through 53 as if fully set forth here.

55. Ganguly made representations to the Plaintiffs, including that she was an agent of Astute and that Plaintiffs' investment in the Astute Program would at all times be kept in a secure escrow account under her control.

56. In reliance on Ganguly's representations, Mr. Rudolf transferred $1,000,000 into the account Ganguly specified on or about April 22, 2012, and Mr. Campbell transferred $1,000,000 into the same account on or about May 23, 2012.

57. Plaintiffs reasonably believed that they had each transferred their funds into the secure escrow account that Ganguly had represented was where their money would remain throughout the pendency of the Astute Program.

58. By reason of Ganguly's representations, Plaintiffs reliance thereon, and her acceptance, as apparent agent for Astute, of Plaintiffs' funds into the Citibank account supposedly for use in connection with the Astute Program, Ganguly stood in a fiduciary relationship with each of the Plaintiffs.

59. Upon information and belief, after Plaintiffs transferred their funds into the account that Ganguly controlled, she wrongfully withdrew Plaintiffs' money to purchase property for herself including, but not limited to, approximately $300,000 worth of jewelry and her current residence at 151 Nicolosi Drive, Staten Island, New York 10312 (the "Wrongfully Acquired Property"). Plaintiffs' funds are directly traceable to the Wrongfully Acquired Property, and Ganguly would be unjustly enriched if permitted to retain any or all of it.

60. Plaintiffs are therefore entitled to have Ganguly declared to be constructive trustee of any such property that she purchased in whole or in part with funds stolen from the Plaintiffs, including, but not limited to, the above-described Wrongfully Acquired Property, and to hold the same for and on behalf of the Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests relief as follows:

A. <u>For their First Claim for Relief</u>, that Plaintiffs be granted judgment against Defendant Ganguly for the total amount of all damages suffered by them as a result of Defendant's fraudulent acts, an amount to be determined at trial but believed to be not less than $2,000,000.

B.      For their Second Claim for Relief, that Plaintiffs be granted judgment against Defendant Ganguly for the total amount of Defendant Ganguly's unjust enrichment at Plaintiffs' expense, an amount to be determined at trial.

C.      For their Third Claim for Relief, that Plaintiffs be granted judgment against Defendant Ganguly for the total amount of all damages suffered by them as a result of her conversion of Plaintiffs' property, an amount to be determined at trial.

D.      For their Fourth Claim for Relief, that this Court (i) decree that Defendant Ganguly is a trustee of any and all property purchased in whole or in part with money withdrawn by Defendant Ganguly from the account at Citibank into which Plaintiff's funds were deposited including, but not limited to, the above-described Wrongfully Acquired Property, and that Defendant Ganguly holds title of the same for the benefit of the Plaintiffs; and (ii) order Defendant Ganguly to convey such property to the Plaintiffs;

E.      And for Any and All Claims for Relief, that Plaintiffs be granted judgment against Defendant Ganguly for punitive or exemplary damages, as well as all costs of this action, including reasonable attorneys' fees, and such other and further relief as may be deemed just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so tirable.

Dated: January 9, 2014  **FRANKFURT KURNIT KLEIN & SELZ, P.C.**
New York, New York

By: _____
Brian E. Maas
Andrew J. Ungberg

488 Madison Avenue
New York, NY 10022
Tel: (212) 980-0120
Fax: (212) 593-9175
bmaas@fkks.com
aungberg@fkks.com

*Attorneys for Plaintiffs James Campbell and Kevin Rudolf*